Cite as 2020 Ark. App. 65

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-19-301

| | |
|---|---|
| | **Opinion Delivered:** January 29, 2020 |
| RON PRUITT | |
| APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73CV-18-210] |
| V. | |
| DIANE BARCLAY | HONORABLE CRAIG HANNAH, JUDGE |
| APPELLEE | |
| | REVERSED AND REMANDED |

**WAYMOND M. BROWN, Judge**

Appellant Ron Pruitt appeals a White County Circuit Court order denying his complaint of unjust enrichment and constructive trust against appellee Diane Barclay upon a finding that appellant failed to establish his burden of proof. We reverse and remand for further proceedings.

Most of the facts of this case are not in dispute. The parties began a romantic relationship in August 2014. Appellee moved into appellant's home approximately a year later, where she remained for over three years. During this time, they kept separate bank accounts and separate vehicles. Appellant paid rent and utilities; appellee paid for food and entertainment. The parties' relationship ended in August 2017. While the parties were still together, appellant paid over $96,000 to renovate appellee's home located in Dover,

Arkansas. Appellant filed a complaint against appellee on March 20, 2018, for conversion, breach of contract, unjust enrichment, and constructive trust.[1] Appellee answered the complaint on April 19.

A trial on appellant's complaint took place on December 17. Appellant essentially testified that during his relationship with appellee, appellee inherited some property in Dover, Arkansas, following her mother's death. He said that they visited the home in April or May 2015; they began cleaning it out around July 2015. He stated that they celebrated Christmas 2015 at the home with appellee's family, but they did not stay the night there. He testified that a new roof was placed on the home in 2015 and that he began demolition in January 2016. He stated that during this time, appellee helped clean up the "stuff" that he tore out. He testified that he tore out the ceilings; stripped down two rooms that were off the carport to the studs; stripped down the kitchen to the studs; and did the same thing to the bathroom and the hall. The small bedroom was stripped down to the insulation and only a small piece of the ceiling in the master bedroom was removed. He said that in addition to his demolition work, the plumbers performed demolition work in the hall bathroom, the half bath, and the master bedroom. He testified that demolition work was also done to the exterior of the home, including the replacement of rotted siding, rotted wood, a fascia and soffits, and window frames for the screened porch. He also said that the main log that holds up the front of the home had to be removed due to water damage and termite activity. He said that his part of the demolition lasted from January to March 2016.

---

[1]Appellant abandoned the breach-of-contract claim at the trial, and he abandoned the conversion claim in his notice of appeal.

He stated that each time he went to the home, appellee was with him. He said that electrical work began in April 2016, and it included rewiring and updating so that it could handle 200-amp instead of its original 60-amp. He stated that at the time of the parties' break-up, the wiring still needed to be tied in. He testified that insulation was installed in several areas of the home. He stated that he also contracted for sheetrock work in June that was completed in September. According to appellant, after the drywall was complete, a central heat and air system was installed. He said that the bathroom was finished, a vinyl plank floor and kitchen backsplash were installed, and the cabinets were installed. He stated that the last work he performed on the home was on August 11, 2017.

Appellant testified that in March 2017, his mother began "feeling bad." He stated that she had a flea market business and wanted him to help her work it. He said that his mother became very ill in June 2017, requiring him to take over running her business. He stated that appellee was not pleased with this decision and accused him of being "addicted to money." He said that he stopped paying for renovations in June 2017, but that he showed up in August to do work again. He testified that they broke up on August 17, 2017, and that he asked appellee to leave his home. He stated that he paid for a majority of the renovations from his savings account, his other two bank accounts, and a small loan. He said that at the time of the renovations, he was making about $60,000 a year. He submitted exhibits showing that $63,365.03 was withdrawn from his savings account; $16,612.38 was charged to his Lowe's credit card; $8,367.77 was charged to his Elan credit card; $4,786.89 was charged to his Chase credit card; $3,334.06 was withdrawn from his M&M bank account; and $267.43 was withdrawn from his household bank account. Appellant's exhibits

3

showed that nearly $97,000 had been spent on renovating appellee's home.  Appellant also submitted sixty-eight photos of the renovations.

Appellant further testified:

> I spent $97,000 on this renovation because I loved Diane.  I loved her very much.  We were in a committed, intimate relationship.  The house was in poor, poor condition.  We both hated to see it continue to deteriorate.  That's the primary reason why.  My understanding is that we were going to use it as a couple.
>
> . . . .
>
> We are here because I expended that money.  I expected that I was going to be paid back.
>
> . . . .
>
> I am asking for the Court to rule that she was unjustly enriched.  She was unjustly enriched because when we were discussing the renovation of the house, we talked about the financing of it.  When we were discussing the renovation of the house, we talked about financing arrangements for the house. First, I researched for Diane a USDA rural development single-family house guaranteed loan.  She didn't meet the requirements.  After that, I went to my bank and I discussed with them a $50,000 loan collateralized by my CD, my money.  I discussed the $50,000 loan with Diane.  She was agreeable to the loan and said that we could pay it back.
>
> . . . .
>
> After I went to the bank about the loan, I told Diane the bank was agreeable.  She agreed to it and said we could pay it back.  I didn't get the loan.  I thought about it for a while myself.  I didn't get the loan because I had the money.  I didn't see any need in order to pay interest.  And so, I loaned the money to ourselves and with her saying that we could pay it back.  I expected that applied to me loaning the money to us instead of the bank. Save us interest.  I did not intend this to be given to her.  She did not send me a thank you letter.  I never sent her a letter to tell her that this was some kind of gift.

Appellee testified that the home in Dover was deeded to her in 2007.  She did not deny "that what has been introduced today was spent on that home."  She also did not deny that the construction and renovation appellant testified to took place following "significant

4

demolition." She said that she considered the renovations to be a gift from appellant. She denied having a problem with appellant spending time with and taking care of his mother. Concerning the renovations, appellee stated the following:

> I could not afford it. I didn't wait until all this happened and then create a situation where we broke up. I didn't ask him to do those things. He did it, I believed, out of care and love for me, and he wanted to ensure my future in case something happened that I would have to live there permanently. I went up there every time that he was there working. I watched all his efforts to renovate the home. I wasn't there every time the contractors were there. Ron never went there without me. He did contract them and do them himself.

> Actually, I asked him at one time, "Why are you doing this?" In fact, several times. And he said, "It's for you." Another time I asked him, he said, "That's your country home." And another time I asked, he said, "That's for you in case something happens to me." And I said, "Like you die?" And he said, "Yes, like I die. You'll have a place." I had no contact with him after we broke up until he sent a letter by priority mail asking for his painting supplies and tools. I didn't believe this home would be mine and Ron's. He would never live there he said. We were not going to rent it out. We were going to use it maybe for a weekend or family gatherings.

On cross-examination, appellee stated that she did not ask appellant for any of this and she told him that she could not afford it. She said that at that time, her income was less than $15,000 a year. She denied knowing that the roof was being replaced until she arrived in Dover and saw the workers on the roof. She further testified:

> There wasn't anything wrong with the roof. It was not leaking. It had been patched. I didn't see anything wrong with it. We were using the house before I ever met Mr. Pruitt. It was fully functional. It is a 1400 square foot house. About 1,000 feet are usable now because two rooms are completely down to the studs. He didn't finish that. There is not one room that's completely finished[.]

> My family had Christmas there the year before this renovation started; December 2015. The first thing that was done was the roof. When I showed up, it was being done. My brother got an estimate for me, and I told them that I couldn't afford it. I couldn't do it. The roof that was on there wasn't even the color that I would have put. I wanted a green roof and it ended up being slate.

> . . . .

5

No. First, when he was tearing the cabinets down, I was like we don't need to do that, we can just paint these. He said, "We're going to Habitat for Humanity." And so we went there. They didn't have cabinets. So we went to Lowe's and purchased cabinets. I wanted kind of a slate blue, and then they ended up white.

. . . .

I couldn't have paid for any of it. I felt like this was a gift. He was doing it out of his love for me and insuring my future, in case I couldn't work, I would have a place and a roof over my head.

Appellee admitted that she agreed to pay for half of the flooring and backsplash materials. However, she stated that appellant never asked her "to pay a dime on any of this other than the backsplash." She said that she did not know how much money was being spent at the time of the renovations. She stated that she "didn't know the full details and how extensive [the renovations] would be." She introduced pictures of the "unfinished items." She stated that the home was fully functional before appellant's renovations, but she now has two rooms that are "no good." She said that the property belonged to her long before she met appellant. She stated that when she asked him whether he wanted his name on the deed, he responded no. She testified that appellant told her he was renovating the home for her in case something happened to him.

Upon examination by the court, appellee stated that her weekly income while she and appellant were dating was about $270. She said that appellant was aware of her income because he prepared her income taxes for two years. She testified that it was her intention to live in the house in Dover in case she could never work. She stated that the condition of the house was not bad and that "everything worked" and was "functional." She admitted that she and appellant had conversations about remodeling the house. However, she stated that her plans were "to paint the walls and the cabinets and maybe new flooring." She said

that it "ended up being more than [she] could afford" and that she informed appellant that she could not afford it. She testified that appellant told her not to worry because he had $50,000 to spend. She said that their only discussion about repayment concerned the vinyl flooring and backsplash installation. She further testified that although she thought they were in a lifetime relationship, she did not believe they would get married. She stated that they had their own separate bank accounts and vehicles. She admitted that if she had never met appellant, her house would not be "updated or modern or whatever you want to phrase it." However, she said that "all the bathrooms functioned, and the kitchen was functional." She testified that everything worked and she never asked appellant to do anything to the home.

On redirect, appellee stated that she never told appellant or anyone else to stop working on the house because appellant was "in control of contracts and work orders and payment." She acknowledged that the house was "more comfortable than before" with the central heating and air. She denied knowing whether she was in a better condition than when she met appellant due to the renovations.

On recross, appellee stated that appellant ended their relationship. She testified that due to the renovations, there is not "one room finished." She said the house had been in her family for over one hundred years, but that now it had "all those unfinished touches."

Appellee's counsel moved to dismiss at the conclusion of appellant's case. The court found that appellant had not met his burden and granted the motion. The order was filed on January 7, 2019. It stated in pertinent part:

> As to unjust enrichment and constructive trust, the Plaintiff failed to show any theory how the Defendant was unjustly enriched, i.e. that (1) the Plaintiff provided

7

funds with the expectation of being reimbursed, (2) that the Defendant accepted funds with the expectation of repaying said funds, and that (3) the Plaintiff failed to prove an amount by which the Defendant was unjustly enriched. The Court finds that the Plaintiff made a gift of the repair and renovation of the Defendant's family home. He failed to establish any beginning or ending value of the home as to how Plaintiffs expenditures enriched the Defendant. The Court was left with pure speculation as to any enrichment and thus the Plaintiff has failed to sustain his burden of proof.

Appellant filed a timely notice of appeal on January 31. This appeal followed.

When deciding a motion to dismiss after the plaintiff rests his or her case during a bench trial, the circuit court must decide whether, if it were a jury trial, the evidence would be sufficient to present to the jury.[2] If the nonmoving party has made a prima facie case on its claim, then the fact-finder must resolve the fully presented case on the merits.[3] When evaluating whether the evidence is substantial enough to make a question for the fact-finder, however, the circuit court may not assess the witnesses' credibility.[4] On appeal, we determine whether dismissal should have been granted by reviewing the evidence in the light most favorable to the party against whom the dismissal was sought, giving it its highest probative value and taking into account all reasonable inferences deducible from it.[5]

An unjust-enrichment claim has legs when a person has received money (or its equivalent) under circumstances that, in equity and good conscience, he or she ought not

---

[2]*Phillips v. Denton*, 2018 Ark. App. 90, 543 S.W.3d 508.

[3]*Id.*

[4]*Id.*

[5]*Williamson v. Williamson*, 2018 Ark. App. 236, 548 S.W.3d 816.

to retain.[6]    The claimant's burden is to "produce evidence permitting at least a reasonable approximation of the amount of the wrongful gain . . . the claimant's burden of proof, so described, is ordinarily met as soon as the claimant presents a coherent theory of recovery in unjust enrichment."[7]    Unjust enrichment can be inferred from the conduct, circumstances, and relationship of the parties.[8]  The unjust–enrichment doctrine is protean, taking on whatever form is required to right a wrong and do justice.[9]

Viewing the evidence in the light most favorable to appellant, we hold that he presented a prima facie case on his claim.  Appellant's evidence showed that he spent nearly $97,000 renovating appellee's home.  Appellee did not contest appellant's evidence on the amount of money spent.  Although appellee maintained that it was a gift, appellant stated that he spent the money with the intentions of being repaid.  This evidence was sufficient to defeat a motion to dismiss at the conclusion of appellant's case.  Accordingly, we reverse and remand for further proceedings.

Reversed and remanded.

VIRDEN and SWITZER, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Robert Hudgins*, for appellee.

---

[6]*Phillips, supra.*

[7]*Id*. at 5, 543 S.W.3d at 511 (quoting *Hartness v. Nuckles*, 2015 Ark. 444, at 8, 475 S.W.3d 558, 564)

[8]*Phillips, supra.*

[9]*Id*.