Cite as 2023 Ark. App. 198

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-22-199

| | |
|---|---|
| RON PRUITT<br>    APPELLANT/CROSS-APPELLEE<br><br>V.<br><br>DIANE BARCLAY<br>    APPELLEE/CROSS-APPELLANT | Opinion Delivered April 5, 2023<br><br>APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73CV-18-210]<br><br>HONORABLE CRAIG HANNAH, JUDGE<br><br>AFFIRMED ON DIRECT APPEAL; CROSS-APPEAL DISMISSED |

**WAYMOND M. BROWN, Judge**

This appeal returns following our remand to the circuit court for further proceedings. In Pruitt's first appeal, *Pruitt v. Barclay*,[1] (*Pruitt I*), we held that the circuit court erred by granting Barclay's motion to dismiss at the conclusion of Pruitt's case because Pruitt had presented a prima facie case on his claim. On remand, the circuit court again ruled in favor of Barclay, finding that Pruitt failed to meet his burden of proof for unjust enrichment. Pruitt appeals, alleging several errors by the circuit court; Barclay cross-appeals the circuit court's decision to prevent her from calling an expert witness at the trial following remand. We find no error and affirm the direct appeal and dismiss Barclay's cross-appeal.

---

[1]2020 Ark. App. 65, 594 S.W.3d 120.

In *Pruitt I*, we set out the facts and pertinent testimony in detail. For purposes of this opinion, we provide the following factual summary. The parties began a romantic relationship in August 2014, and Barclay subsequently moved into Pruitt's residence about a year later. Although the parties lived together, they kept separate bank accounts and vehicles. Pruitt paid the rent and utilities, and Barclay paid for food and entertainment. During the relationship, Pruitt paid over $96,000 toward renovations on Barclay's home located in Dover, Arkansas. The parties' relationship abruptly ended in August 2017. On March 20, 2018, Pruitt field a complaint against Barclay for conversion, breach of contract, unjust enrichment, and constructive trust.[2] Barclay answered the complaint on April 19, denying the material allegations of Pruitt's complaint.

A trial on Pruitt's complaint took place on December 17. Pruitt testified that Barclay inherited some property in Dover, Arkansas, during their relationship. He said that after visiting the home in April or May 2015, they began cleaning it out around July 2015. He stated that a new roof was placed on the home sometime in 2015 and that he began demolition on the home in January 2016. He testified that Barclay helped clean up the "stuff" he had torn out during demolition. He said that he tore out the ceilings, stripped down two rooms that were off the carport to the studs, stripped down the kitchen to the studs, and did the same thing to the bathroom and the hall. He stated that the small bedroom was stripped down to the insulation and that only a small piece of the ceiling was

---

[2]Pruitt abandoned the breach-of-contract claim at trial, and he abandoned the conversion claim in his first notice of appeal.

removed in the master bedroom. He said that plumbers also performed demolition work in certain parts of the home. He further stated that rotted areas on the outside of the home were replaced and that the main log that held up the front of the home had to be removed due to water and termite damage. He stated that he performed demolition on the home from January to March 2016 and that Barclay was with him each time he went to the home. He said that electrical work was performed on the home in April 2016, allowing the home to handle 200 amps instead of 60 amps that it originally handled. However, he said that at the time of the parties' breakup, the wiring still needed to be tied in. Pruitt testified that several areas of the home had insulation installed; that sheetrock work was completed in September; that the bathroom was finished; that a vinyl plank floor, kitchen backsplash, and cabinets were installed; and that a central heat and air system was installed. He stated that he last worked on the home on August 11, 2017.

Pruitt stated that he and Barclay began having relationship problems after his mother fell ill in March 2017 and he had to take over running his mother's business. He said that he stopped financing the renovations in June 2017, but he showed back up in August to do work. He stated that he and Barclay broke up on August 11, and he asked her to leave his home. He said that he paid for the renovations mostly from his savings account, his other two bank accounts, and a small loan. He presented exhibits showing that he had spent nearly $97,000 renovating Barclay's home. He also submitted sixty-eight photos of the renovations.

Pruitt testified that he spent the money on the renovations because he loved Barclay very much, and they were in an intimate relationship. He said that neither of them wanted

to see the home deteriorate any further than it already had. He also stated that it was his understanding that they would use the home as a couple. However, he also testified that he spent so much money because he expected to be repaid. He testified that when he was talking about obtaining a $50,000 loan, Barclay "was agreeable to the loan and said that we could pay it back." He said that he did not get the loan because he had the money. Pruitt testified, "And so, I loaned the money to ourselves and with her saying that we could pay it back. I expected that applied to me loaning the money to us instead of the bank. Save us interest. I did not intend this to be given to her."

Barclay testified that she was deeded the home in 2007. She did not deny the amount of money Pruitt claimed to have spent renovating the home after "significant demolition." She stated that she considered the renovation to be a gift. She admitted that she could not afford to renovate the home; however, she said that she did not ask Pruitt to renovate it either. She stated that she thought Pruitt renovated the home out of "care and love" for her and to "ensure [her] future in case something happened that [she] would have to live there permanently." Barclay testified that she was at the home each time Pruitt was there and that she watched his efforts. She further stated,

> Actually, I asked him at one time, "Why are you doing this?" In fact, several times. And he said, "It's for you." Another time I asked him, he said, "That's your country home." And another time I asked, he said, "That's for you in case something happens to me." And I said, "Like you die?" And he said, "Yes, like I die. You'll have a place." I had no contact with him after we broke up until he sent a letter by priority mail asking for his painting supplies and tools. I didn't believe this home would be mine and Ron's. He would never live there he said. We were not going to rent it out. We were going to use it maybe for a weekend or family gatherings.

Barclay stated that she did not ask Pruitt for the renovations, and she could not afford it with her $15,000 a year income. She said that she did not even know that the roof was getting replaced until she arrived at the home and saw workers on the roof. She stated that there was nothing wrong with the roof when Pruitt replaced it. She said that the 1400-square-foot home was fully functional before she met Pruitt and that now only 1000 square feet are usable because the rooms had been stripped down to the studs and not finished. She testified that there is not a single room completely finished. She stated that her family was able to celebrate Christmas 2015 at the home before the renovations started. She admitted that her brother had gotten an estimate for the roof for her, but she told them that she could not afford the price. She said that the roof on the home is not even the color she wanted—she wanted green, and it ended up slate. She stated that when Pruitt was tearing down the cabinets, she told him that they could just paint them. He told her that they could go to Habitat for Humanity for cabinets, but they did not have any. They subsequently went to Lowe's and purchased white cabinets even though she wanted slate blue cabinets. Barclay stated, "I couldn't have paid for any of it. I felt like this was a gift. He was doing out of his love for me and ensuring my future, in case I couldn't work, I would have a place and a roof over my head." She stated that she agreed to pay for half of the flooring and backsplash materials. She said appellant never asked her to pay anything except for the backsplash. Barclay testified that she did not know how extensive the renovations would be, and she did not know how much money was being spent at the time. She stated that the house belonged to her before she met Pruitt and that it was fully functional before the renovations, but she

now has two rooms that are useless. Barclay testified that when she asked Pruitt if he wanted his name on the deed, he said no and told her that he was renovating the home for her in case something happened to him.

Barclay testified that her weekly income while she and Pruitt were dating was about $270 and that Pruitt was aware of the income because he prepared her income taxes for two years. She stated that she intended to have the home in Dover in case she was unable to work in the future. She said that everything worked in the home. She admitted that she and Pruitt talked about remodeling the house, but she thought they would paint the walls and cabinets and maybe put in new flooring. She said that when she told Pruitt that she could not afford the renovations, he told her "not to worry because he had $50,000 to spend." She stated that they only discussed repayment for the vinyl flooring and backsplash installation. She admitted that if she had never met Pruitt, the home would not be "updated or modern," but she said at least all the bathrooms and the kitchen were functional, and everything worked.

Barclay stated that she never told Pruitt or anyone to stop the renovations because Pruitt was in control of everything. Although she admitted that the home was more comfortable than it was before with the central heating and air, she denied that the home was in a better condition since the renovations. She stated that there was not one finished room in the home due to the renovations and that the home had been in her family for over one hundred years.

Barclay's attorney moved for dismissal at the conclusion of Pruitt's case. The circuit court granted the motion, finding that Pruitt had not met his burden. Pruitt filed a timely notice of appeal, and we remanded for further proceedings in January 2020. After our remand, Pruitt sought a new trial on his claim. The circuit court denied that request and held that it would pick up where the last trial ended, at Barclay's case. The circuit court found that Pruitt would "not be allowed to retry [his] case."

The continuation of the trial took place on September 30, 2021. Pruitt unsuccessfully renewed his request for a new trial. Barclay also asked the circuit court to reconsider its decision to not allow Barclay's expert witness, Brian Mayhan, to testify, which the circuit court declined to do.

Dan McAlister, Barclay's brother, testified that he lives across the pasture from the home in question. He stated that it is a family home dating back to his great-granddad. He said that before the renovations, the home was a log homestead built in 1806 and purchased by his family in 1908. He said that the house was passed down and was the first house his dad had lived in when he first got married. He stated that the home was rented out for many years after his dad went into the military. However, he said that his family moved back into the home in 1968 when the nuclear plant opened in Russellville. He stated that there was no running water at that time, and he described it as "an old shack of a house." He said that two rooms and a carport were subsequently added to the west side of the home. He stated that when his grandmother was going to move into the home, a bedroom, bathroom, and screened porch were added to the east side of the home. McAlister testified that they just

7

covered up the old logs and shakes when they added onto the home. He stated that the home is sitting on rocks and that there is no foundation. He said that prior to the renovations, the home was heated by propane and was cooled with a big window unit. When asked about heating and cooling since the renovations, he stated that it cools and heats about how it did before the renovations. He said that the home is "pretty cold" in the winter because "it's not finished. There's no baseboards on it. There's no door casings. I mean, it's just – it's still open." He stated that the home only has a foundation on the sides. He said that the two rooms added to the west side of the home are unfinished and stripped down to just the bare walls and can only be used for storage. He also stated the rugs have to be placed under the kitchen door in the winter to keep cold air from coming into the other parts of the home from the unfinished rooms. He testified that when the lights were placed in the bathroom, a stud or ceiling joist was hit, so another hole was cut, but the first hole was never patched. He said that he had to stop up the first hole to keep hot air from escaping into the attic. He stated that Pruitt replaced the roof but that nothing was wrong with the old roof. He said that he asked Pruitt why was he doing anything to the home, and Pruitt told him that Pruitt wanted Barclay to have a nice place to live if anything happened to him.

On cross-examination, McAlister testified that the home only leaked in the laundry room. He stated that there had been a leak in the master bedroom years ago when the shingles blew off, but he replaced them. He said that the main part of the home has two layers of shingles, and the carport has a tin roof because it is flat. He stated that the materials for the roof were there a number of weeks before work began on the roof. He said that the

parties wanted to put a metal roof on the home and that Barclay asked him to get an estimate. He stated that he did not remember the estimate, but he did remember that "compared to shingles it was just unreal." He admitted that there is a new roof on the home. He said that the home had some termite damage. He stated that the electrical service of the home was updated from 100 amp to 200 amp and that the aluminum wiring had to be replaced. He said that Barclay personally told him that she had asked Pruitt to stop renovations at the beginning of demolition but that Pruitt did not stop. He stated that Barclay was there while the demolition was going on. McAlister admitted that the home now has central heating and air. He stated that Barclay has lived in the home for about two years.

Brian Jolly, Barclay's son, testified that Pruitt told him he was putting so much money into the home because Pruitt cared about Barclay and wanted her to have somewhere comfortable to live if something happened to Pruitt. He said that Pruitt indicated that he wanted to take care of Barclay "in the long run." He stated that the home is more comfortable in terms of having central heating and air; however, he stated that he was unsure if the heat or air worked because he had not been to the home in two years.

On cross-examination, Jolly stated that Barclay talked to him about making cosmetic changes to the home, such as painting the walls and the kitchen cabinets. He said that he was not involved in the project at all.

On rebuttal, Jolly denied taking a lead role in hiring the workers and contractors or in scheduling the times, dates, and payments with respect to the renovations.

At the conclusion of the testimony, the circuit court stated the following:

9

I've had a chance to review the prior proceeding, the facts that were represented in that hearing and what I've heard today. I find that the parties were in a romantic relationship. I think at the time they believed that it was going to be a long-term relationship, that abruptly ended. During that relationship, I think it was clear [Pruitt] wanted to take care of [Barclay] and so stated that to at least a couple of people. I find that [Barclay] didn't have an expectation of having to repay and didn't even have the ability to repay. I find that [Pruitt] had made a gift of the repair and renovations to [Barclay's] home, and he has failed to establish a value of the home before and after to show how [Barclay] was possibly unjustly enriched. That would just leave the Court with speculation as to what the enrichment ~ if it had happened, what it was – what amount would be assessed. So I find [Pruitt] has failed to sustain his burden of proof.

The circuit court filed its order on October 26, 2021, restating its oral announcement. The order also indicated that Pruitt's request for a new trial was denied as was Barclay's request to have appraiser Mayhan testify. Pruitt filed his notice of appeal on November 10; Barclay filed her notice of cross-appeal on November 18.

For his first point on appeal, appellant argues that the circuit court erred by not granting him a new trial following remand from this court. He relies on dicta in *Rymor Builders, Inc. v. Tanglewood Plumbing Co.*,[3] to support his contention that a new trial was warranted. However, we are not persuaded that a new trial was required. The circuit court did exactly what it was instructed to do—conduct further proceedings after it erroneously granted Barclay's motion to dismiss before she ever presented her case. The same judge sat as the fact-finder after remand, and he stated that he had a chance to review the testimony elicited at the prior proceeding as well as take into account the testimony presented at the

---

[3]100 Ark. App. 141, 265 S.W.3d 151 (2007).

subsequent trial. We hold that the circuit court followed the letter and spirit of the appellate mandate by continuing the trial where it left off. Pruitt is attempting to have a second bite of the apple, which we will not allow.[4]

As his second point on appeal, Pruitt argues that the circuit court erred in finding that he did not prove his claim for unjust enrichment. The issue of unjust enrichment is a question of fact.[5] We review findings made at a bench trial to determine whether they are clearly erroneous or clearly against the preponderance of the evidence.[6] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made after a review of all the evidence.[7] Facts in dispute and credibility determinations are within the province of the fact-finder.[8] An unjust-enrichment claim has legs when a person has received money (or its equivalent) under circumstances that, in equity and good conscience, he or she ought not to retain.[9] The claimant's burden is to "produce evidence permitting at least a reasonable approximation

---

[4]Pruitt's reliance on *Carton v. Missouri Pacific Railroad Co.*, 303 Ark. 568, 798 S.W.2d 674 (1990), is also misplaced because in a jury trial, a new trial is warranted when there have been evidentiary errors committed during the trial and the chances of empaneling the same jury on remand is practically impossible.

[5]*Feagin v. Jackson*, 2012 Ark. App. 306, 419 S.W.3d 29.
[6]*Sims v. Moser*, 373 Ark. 491, 284 S.W.3d 505 (2008).

[7]*Id.*

[8]*Id.*

[9]*Phillips v. Denton*, 2018 Ark. App. 90, 543 S.W.3d 508.

11

of the amount of the wrongful gain . . . the claimant's burden of proof, so described, is ordinarily met as soon as the claimant presents a coherent theory of recovery in unjust enrichment."[10] Unjust enrichment can be inferred from the conduct, circumstances, and relationship of the parties.[11]  The unjust-enrichment doctrine is protean, taking on whatever form is required to right a wrong and do justice.[12]

Here the circuit court found that Pruitt's nearly $97,000 renovation of Barclay's home was a gift for which Pruitt did not expect repayment.  The circuit court was presented with conflicting testimony from the parties and their witnesses, and it was in the best position to judge the credibility of the witnesses.  Ultimately, the circuit court credited testimony that Pruitt performed the renovations on the home because he cared about Barclay and wanted her to have somewhere comfortable to live if anything were to ever happen to him.  Under these facts, we cannot say that the circuit court erred.  Accordingly, we affirm.

To the extent that Pruitt makes an argument concerning the circuit court's statement about the before and after value of the home, it was made to show that had the circuit court found that Barclay had been unjustly enriched, it would be unable to quantify the amount of the enrichment.  However, the circuit court did not find unjust enrichment.

---

[10]*Id.* at 5, 543 S.W.3d at 511 (quoting *Harness v. Nuckles*, 2015 Ark. 444, at 8, 475 S.W.3d 558, 564).

[11]*Phillips*, *supra.*

[12]*Id.*

Pruitt also contends that the circuit court erred by finding that he did not prove his claim for a constructive trust. This argument is misplaced because there can be no constructive trust without an unjust enrichment. A claimant seeking restitution for unjust enrichment can generally recover the value of the benefit conferred upon the party unjustly enriched.[13] A constructive trust is only one of several remedies available.[14] Under Arkansas law, a constructive trust is available when an unjust enrichment demands relief, and the legal relief in the form of money is not adequate or, more precisely, is not as adequate as a constructive trust.[15] Here, there was no unjust enrichment, so there could be no constructive trust.

Barclay argues on cross-appeal that the circuit court erred by not allowing Mayhan to testify; however, she states in her brief that her argument is made just in case we reverse and remand this case to the circuit court. Because we have affirmed on direct appeal, Barclay's cross-appeal is moot, and we dismiss it.

Affirmed on direct appeal; cross-appeal dismissed.

VIRDEN and GRUBER, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant/cross-appellee.

---

[13]*Id.*

[14]*Id.*

[15]*Id.*

*Robert Hudgins*, for appellee/cross-appellant.